UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

TAYLOR BOYNTON,                      )
                                     )
            Plaintiff,               )
                                     )
     vs.                             )     Case No. 5:23-cv-00351-HNJ
                                     )
STONE AGE BBQ, LLC,                  )
                                     )
            Defendant.               )

## MEMORANDUM OPINION

This civil action proceeds before the court on Defendant Stone Age Korean BBQ's Motion for Partial Summary Judgment, (doc. 45), and Motion to Strike portions of Plaintiff Taylor Boynton's deposition testimony relied upon in his response, (doc. 51).

As illustrated herein, the court **DENIES**, in part, Stone Age's Motion to Strike, as Boynton can reduce Ayana Varnes's out-of-court statement to admissible evidence at trial. The court deems Stone Age's objection to out-of-court statements by a prior coworker **MOOT** because the court does not rely on those statements to adjudicate Stone Age's summary judgment motion.

Furthermore, there exist genuine issues of material fact as to whether Stone Age discharged Boynton in retaliation for his complaints regarding FLSA violations. Accordingly, the court **DENIES** Stone Age's Motion for Partial Summary Judgment.

## STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

> party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, the non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's

claim," namely, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). In other words, the movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, but the court should deny summary judgment if reasonable jurors could "differ as to the import of the evidence." *Id.* at 250.

## EVIDENTIARY OBJECTIONS

As an initial matter, Stone Age contends two portions of Boynton's deposition testimony, consisting of a total of 35 lines, constitute inadmissible hearsay the court should strike from the record. (Doc. 51). Based upon prevailing legal principles, Stone Age errs in its entreaty as to Ayana Varnes's out-of-court statement.

Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Most of the deposition testimony contested by Stone Age comprises Boynton's personal observations. (Doc. 44-5 at 46:11-15, 46:23-47:16, 47:18-48:1). Stone Age's hearsay objection essentially challenges Boynton's references to two statements rendered by other individuals: a text message from Boynton's then-girlfriend regarding the reason

4

Stone Age discharged Boynton, and a former coworker's statement about Stone Age's practice of collecting a portion of servers' tips. (Doc. 44-5 at 46:16-20, 47:17-18).

In general, "inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11ᵗʰ Cir. 1999) (footnote omitted) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1ˢᵗ Cir. 1990)). However, a court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial." *Id.* at 1323 (quotation omitted).

The Eleventh Circuit grants "[t]he most obvious way to reduce hearsay to admissible form is to call the declarant to testify at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11ᵗʰ Cir. 2012). Contrastingly, court decisions decline to appraise hearsay statements on summary judgment when a party fails to explain how the statement could be admissible at trial or asserts an erroneous exemption or exception for the statement. *See Taffe v. Wengert*, 775 F. App'x 459, 465 (11ᵗʰ Cir. 2019) (declining to consider a hearsay statement within a witness's testimony when the witness attributed the statement to "someone named Nate," "Nate" did not testify, and the plaintiff "fail[ed] to explain how the hearsay statement could be reduced to admissible evidence at trial"); *King v. Kirkland's Stores, Inc.*, No. 2:04-CV-1055-MEF, 2006 WL 2239203, at *3 (M.D. Ala. Aug. 4, 2006) (striking plaintiffs' deposition testimony as Federal Rule of Evidence 801(d)(2)(D) did not exempt the statement from the hearsay rule and they "urged no other basis for [the testimony's] potential admissibility"); *Ferrell v. Masland*

*Carpets, Inc.*, No. 99-0134-RV-S, 2000 U.S. Dist. LEXIS 12992, at *8 (S.D. Ala. April 17, 2000) (holding, in part, the court could not consider statements plaintiff represented as admissible under Rule 801(d)(2)(D) because the declarants of these statements did not express the statements within the scope of their employment).[1]

Based upon the foregoing legal principles, Stone Age's objections warrant overruling. Stone Age's objections rest upon the erroneous proposition that an out-of-court statement slated for trial admissibility must derive from a declarant's expression in their own affidavit or deposition. That is, Stone Age maintains a hearsay declarant must also constitute an affiant or deponent to permit reliance upon their out-of-court statement at the summary judgment stage. (*See* Doc. 57 at 2 ("Specifically, while a deponent could certainly reduce his own testimony contained in the pages of a deposition to admissible evidence by testifying at trial, he cannot rely on a third party's hearsay statement which is not supported by affidavit or deposition."); *id.* at 3 ("Simply put, the challenged statements from Plaintiff's girlfriend and co-worker are hearsay for

---

[1] In addition, the Eleventh Circuit maintains summary judgment appraisals must forswear hearsay evidence when the "declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement." *Jones*, 683 F.3d at 1294. "The possibility that the declarant might change his sworn testimony and admit to the truth of the hearsay statement amounts only to 'a suggestion that admissible evidence might be found in the future,' which 'is not enough to defeat a motion for summary judgment.'" *Id.* (quoting *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11ᵗʰ Cir. 1996), *aff'd sub nom. McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781 (1997) (determining hearsay statements from prosecution's witnesses averring state officials coerced them to testify at plaintiff's criminal trial could not create a genuine issue of fact when those same witnesses "now say in sworn affidavits that they were not coerced and testified truthfully at trial")); *see also Macuba*, 193 F.3d at 1322 (holding the district court erred in considering hearsay statements contained within a witness's deposition and affidavit when the alleged declarant filed a separate affidavit contradicting the hearsay statements attributed to the declarant); *Jones*, 683 F.3d at 1294 (ruling plaintiff could not rely upon his hearsay statement in an email when plaintiff contradicted the supposed statement in his own deposition testimony).

which Plaintiff offered no affidavit or deposition testimony.")).  That proposition does not reflect the prevailing legal principles.

To wit, the decision in *Coffman v. Battle*, 786 F. App'x 926 (11ᵗʰ Cir. 2019), portrays a court may readily evaluate a hearsay statement at the summary judgment stage when the declarant remains available to testify to at trial, despite the declarant's articulation of the statement in a context that does not constitute an affidavit, declaration, or deposition.  In the proceedings below, the district court reviewed a summary judgment motion regarding an Fourth Amendment excessive force claim against an officer, defendant Battle.  A fellow officer, Hudson, recounted the statements Battle expressed after tasing the plaintiff, and a Georgia Bureau of Investigations Special Agent memorialized Hudson's hearsay in his investigative report of the incident.  The district court recognized the report itself constituted hearsay, yet the court held the plaintiff "may reduce the contents of the report to admissible form by calling Officer Hudson at trial."  *Coffman v. Battle*, No. 4:18-CV-00022-HLM, 2019 WL 10303633, at *2 n.1 (N.D. Ga. Jan. 22, 2019), *aff'd*, 786 F. App'x 926 (11th Cir. 2019).

The Eleventh Circuit affirmed the district court's ruling, finding the defendant had not argued, and there existed "no indication in the record," Hudson was unavailable to testify at trial, even though no affidavit or deposition served as the repository for Hudson's statement.  *Coffman*, 786 F. App'x at 934; *see also Smith v. LePage*, 834 F.3d 1285, 1296 n.6 (11ᵗʰ Cir. 2016) (holding on summary judgment review that the district court could consider a declarant's out-of-court statement perceived by another witness,

7

even though the declarant had not testified about the matter in his deposition, because no one asked him about the statement during the deposition and he did not testify in contradiction to the statement at issue).

The district court opinion in *Larweth v. Magellan Health, Inc.*, No. 6:18-CV-823-ORL-41DCI, 2019 WL 11866499 (M.D. Fla. Dec. 17, 2019), aptly portrays the applicable legal principles regarding the issue at bar:

> "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote and quotation omitted). But, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1323 (quotations and citations omitted). Originally, it appears that the Eleventh Circuit considered hearsay evidence that could be reduced to an admissible form to be evidence that "falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence)." *Id.* at 1323–24.

> However, subsequent *Eleventh Circuit cases have broadened the concept, allowing otherwise inadmissible hearsay to be considered on summary judgment in circumstances such as these—i.e., where the witness testifies as to what someone else told him for the truth of the matter asserted and where no hearsay exception exists—if the hearsay declarant is identified and could testify at trial, **whether or not there is any evidence presented at summary judgment from the third party**.* See Coffman v. Battle*, No. 19-10592, 786 Fed. Appx. 926, 2019 WL 4300657, at *6 (11th Cir. Sept. 11, 2019) (explaining that "[m]ore recently, [the Eleventh Circuit] concluded that a district court did not err in considering a hearsay statement at the summary judgment stage where the hearsay declarant could testify to the relevant facts at trial and had not otherwise offered contradictory statements" and citing *Smith v. LePage*, 834 F.3d 1285, 1296 n.6 (11th Cir. 2016) and *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012)); *Brannon v. Finkelstein*, 754 F.3d 1269, 1277 n.2 (11th Cir. 2014) (noting that even if certain testimony was hearsay, "it should be considered on summary judgment here because it can be

reduced to an admissible form at trial" by having the hearsay declarant testify). *But see Shockley v. Barbee*, 747 F. App'x 754, 757 (11th Cir. 2018) (holding that inadmissible hearsay could not be considered on summary judgment even where the hearsay declarant was identified but relying on *Macuba* without discussing subsequent case law or discussing whether the hearsay declarant could have testified at trial).

The line drawn by the Eleventh Circuit seems to be where the third party is unknown or hypothetical or where the hearsay declarant has testified in contradiction to the hearsay; at that point, the hearsay cannot be considered on summary judgment. *See Edwards v. Nat'l Vision Inc.*, 568 F. App'x 854, 858 (11th Cir. 2014) (affirming the district court's decision to strike hearsay statements of unidentified third parties); *Jones*, 683 F.3d at 1294 ("If, however, the declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement, [courts] may not consider the hearsay statement at the summary judgment phase."). *But see Robertson v. Interactive Coll. of Tech./Interactive Learning Sys., Inc.*, 743 F. App'x 269, 274 (11th Cir. 2018) (affirming the district court's decision not to consider hearsay on summary judgment where the declarant was identified but "nothing in the record indicates that [the declarant] or anyone else with personal knowledge of the incident was going to testify at trial so as to reduce the hearsay testimony into an admissible form" and relying on *Jones*, 683 F.3d at 1293–94).

*Larweth*, 2019 WL 11866499, at *17-18 (emphasis added).[2]

---

[2] To the extent the *Larweth* decision cites *Shockley v. Barbee*, 747 F. App'x 754, 757 (11th Cir. 2018) and *Robertson v. Interactive Coll. of Tech./Interactive Learning Sys., Inc.*, 743 F. App'x 269, 274 (11th Cir. 2018) as evidence of "murky" caselaw on this issue, those cases actually do not support any propositions contrary to the legal principles postulated by the decision.

As applicable here, the *Shockley* decision rejected a hearsay statement purportedly rendered by an unidentified third party, which obviously constitutes hearsay irreducible to an admissible form at trial. *See Shockley*, 747 F. App'x at 757 ("Sergeant Pam Williams heard from a third party that Barbee said, 'Hey, boy. Go get my car washed.' She 'didn't hear it personally.'"). To be sure, the *Shockley* decision rejected a hearsay statement purportedly uttered by the plaintiff to another witness regarding the alleged offender's use of a racial epithet against the plaintiff. *Id.* Yet the district court opinion reveals the plaintiff himself forswore the alleged offender used racial epithets against him, which manifests a contradiction rendering the plaintiff's hearsay statement inadmissible. *See Shockley v. Macon Bibb Cnty., Ga.*, No. 5:15-CV-452 (MTT), 2017 WL 3599168, at *4 (M.D. Ga. Aug. 21, 2017), *aff'd in part, dismissed in part sub nom. Shockley v. Barbee*, 747 F. App'x 754 (11th Cir. 2018) ("But Shockley has provided no evidence, other than his own belief and that of one other officer, Shelly Rutherford, to

Indeed, Eleventh Circuit precedent establishes the prevailing legal principles in this context bear longstanding provenance:

> In *Offshore Aviation* [*v. Transcon Lines, Inc.*, 831 F.2d 1013 (11th Cir. 1987)], we held that the district court should have considered a letter offered in opposition to a motion for summary judgment. 831 F.2d at 1015. The party moving for summary judgment argued for the first time on appeal that the letter was inadmissible hearsay. *Id.* We held that the objection to the letter's admissibility was untimely and that the district court should have considered the letter in its summary judgment decision. *Id.* at 1016. We also noted that the fact that the letter itself would be inadmissible at trial did "not undercut the existence of any material facts the letter may [have] put into question." *Id.* at 1015. Though we agree with McMillian that this and certain other language in our opinion suggests that inadmissible hearsay may be used to defeat summary judgment, we do not read *Offshore Aviation* to hold that inadmissible hearsay may be used even when it cannot be reduced to admissible evidence at trial. *There was no indication in Offshore Aviation that the letter could not be reduced to admissible evidence at trial. Indeed, that the letter at issue was based on the writer's personal knowledge, id.* at 1016, **indicates that there was no impediment to the writer testifying at trial as to the facts described in the letter**.

---

establish Barbee's treatment of him was based on his race. Docs. 39 at 184:6-13 ('[Question]: Is there anything objective that you can point to that would indicate [race] was the basis for [the harassment] other than your ... perception and opinion[?] [Shockley:] No.'), 276:14-278:11 ('Shockley: My perception ... I feel it's that way.'); 41 at 28:18-19 ('Rutherford: I find—me, personally, that's just my opinion. I find that to be a racist act.'). It is undisputed that there were no overt or express racist acts or comments, such as Barbee calling Shockley racial epithets or using offensive language towards Shockley.") (footnote omitted); *see also Shockley*, 747 F. App'x at 757 ("Shelly Rutherford testified that *Shockley told her* that Barbee said something like, 'I need you to go wash my car, boy.'") (emphasis in original).

In a similar vein, the *Robertson* decision concerned hearsay statements by declarants who would not testify at trial. *See Robertson*, 743 F. App'x at 274 (The "testimony relaying what Ramirez told Ms. Robertson about [Mr. Robertson's] absences and termination constitutes hearsay, because Ramirez's statement is being used to prove the truth of the matter asserted. See Fed. R. Evid. 801. Moreover, nothing in the record indicates that Ramirez or anyone else with personal knowledge of the incident was going to testify at trial so as to reduce the hearsay testimony into an admissible form.").

Hence, the caselaw actually manifests more clearly than the *Larweth* decision's representation.

*McMillian* 88 F.3d at 1584-85 (emphasis added).[3]

Applying the foregoing legal principles to the action at bar, Boynton can reduce Ayana Varnes's text message to admissible evidence at trial, and thus, it properly serves as evidence for the summary judgment adjudication.  In his deposition, Boynton testified Varnes texted him when Stone Age discharged him: "I think I even got a text from my girlfriend saying like, 'Yes, this was all to teach you a lesson, and he said if you come back and admit you were wrong and all this, they might let you have your job back.'"  (Doc. 44-5 at 46:16-20).  This statement, in its current form, contains hearsay within hearsay, so Boynton must demonstrate he can reduce both hearsay statements to an admissible form to merit consideration on the summary judgment determination.  *Macuba*, 193 F.3d at 1323.

This issue presents a situation analogous to the issue addressed in *Coffman*.  Varnes's text message parallels Officer Hudson's statements in the GBI report.  Just as the *Coffman* decision ruled the plaintiff could render Officer Hudson's out-of-court statements admissible at trial as there existed no impediment to Hudson testifying at the proceeding, Varnes can testify at trial as to the sentiments expressed in her text to

---

[3] The only cases possibly supporting Stone Age's proposition constitute district court opinions that cannot supersede the precedential and more persuasive Eleventh Circuit decisions discussed herein.  *See Marshall v. Planz*, 13 F. Supp. 2d 1246, 1256 (M.D. Ala. 1998); *Bush v. Barnett Bank of Pinellas Cnty.*, 916 F. Supp. 1244, 1256 (M.D. Fla. 1996); *King*, 2006 WL 2239203, at *1-4; *Ferrell*, 2000 U.S. Dist. LEXIS 12992, at *8.  The only Eleventh Circuit decision relied upon by Stone Age that has not been reviewed thus far concerned unknown hearsay declarants.  *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir.), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) ("There is nothing to indicate that Pritchard's statements (which were based on the statements of unknown co-workers) will lead to admissible evidence.").

Boynton. That is, Boynton can reduce Varnes's statement to an admissible form by calling Varnes to testify at trial to as to the alleged conversation she had regarding Boynton's discharge.[4] *See Jones*, 683 F.3d at 1293-94; 11 MOORE'S FEDERAL PRACTICE - CIVIL § 56.91 (2021) ("When an objection to summary judgment evidence is made, the court must draw distinctions between inadmissible content . . . and inadmissible form . . . ."); *see also Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose [his] own witnesses.").

As for the hearsay statement within Varnes's statement (i.e., the expressions attributed to "he"), Stone Age contends the declarant constitutes an unknown party, whereas Boynton asserts Stone Age manager Tim Swearingen constitutes the declarant. Courts cannot appraise hearsay evidence attributed to an unknown declarant. *Jones*, 683 F.3d at 1294 ("The possibility that unknown witnesses will emerge to provide testimony on this point is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial."); *compare Pritchard*, 92 F.3d at 1135 (holding plaintiff could not rely on statements of coworkers, whose names she could not recall, to defeat summary judgment) *and Marshall*, 13 F. Supp. 2d at 1256 (M.D. Ala. 1998) (holding, in

---

[4] Contrary to Stone Age's contention Varnes's potential testimony equates to the possibility of an unknown witness emerging at trial, Boynton listed Varnes as a trial witness in response to Stone Age's interrogatories. (Doc. 44-3 at 4-5). Therefore, the record reflects Boynton expects Varnes to testify should the case proceed to trial.

part, plaintiff could not defeat defendants' motion for summary judgment with hearsay statements attributed to "various and sundry" unidentified people) *with Brannon v. Finkelstein*, 754 F.3d 1269, 1277 n.2 (11th Cir. 2014) (holding plaintiff's testimony about conversations in which he "could not recall the specific words used in each conversation, [but] he recalled the names of the Assistant Public Defenders with whom he spoke," warranted consideration on summary judgment).

Stone Age's entreaty warrants no relief in this regard.  Drawing all reasonable inferences in Boynton's favor, the court credits his assertion, ostensibly based upon personal knowledge of his conversation with Varnes, that "he" refers to Swearingen.[5] *See Reeves*, 530 U.S. at 150 (citations omitted).  Assuming Swearingen uttered the statement, Federal Rule of Evidence 801(d)(2)(D) excludes it from hearsay as an Opposing Party's Statement, as Swearingen represented Stone Age as an employee at the time of the statement.[6]  Therefore, this statement would be admissible at trial.[7]

---

[5] Stone Age may further challenge this assessment at trial if it presents evidence to the contrary.

[6] Federal Rule of Evidence 801(d)(2)(D) clearly applies to this statement, as Stone Age asserts Tim Swearingen made the decision to discharge Boynton.  (*See* Doc. 44-4 at 68:6-16; Doc. 44-2 at 8); *cf. Ferrell*, 2000 U.S. Dist. LEXIS 12992 at *8 (holding lead supervisor's statements inadmissible under Rule 801(d)(2)(D) because declarant did not have any authority to speak on company personal matters and did not have any role in the decision to discharge plaintiff).

[7] Defendant also objects to a statement in Boynton's testimony attributed to a former Stone Age server, "Brandon."  Specifically, Boynton testified "Brandon" displayed a PowerPoint presentation to servers about Stone Age illegally taking workers' tips, during which "Brandon" remarked, "This is wrong, what they're doing."  (Doc. 44-5 at 47:17-18).  The court did not rely on this statement in ruling on the motion for summary judgment, and thus, finds this objection moot.

## BACKGROUND

The court adopts the following facts for the summary judgment determination, drawn from the evidence taken in the light most favorable to Boynton, the non-moving party.

On September 14, 2023, Plaintiff Taylor Boynton filed an amended complaint alleging his employer, Defendant Stone Age Korean BBQ, failed to appropriately compensate him for overtime hours worked (Count I) and discharged him in retaliation for complaints he made about overtime he believed he should have received (Count II). (Doc. 20). On August 5, 2025, the court entered judgment as to Count I pursuant to Boynton's acceptance of an Offer of Judgment. (Doc. 59). Count II remains before the court on this motion for summary judgment. (Doc. 45).

Boynton worked for Stone Age for approximately two and a half years, commencing in September 2020. (Doc. 44-5 at 16:11-17, 19:3-5). During his employment, he worked in a variety of positions, including manager, bartender, and server. (Doc. 45-1 at ¶ 2).

By the time Boynton received his second paycheck, he suspected Stone Age did not accurately compensate him for his overtime hours. (Doc. 44-5 at 31:18-32:21). He raised the issue with management at that time. (*Id.* at 33:17-34:15). He verbally complained to management about the issue at least six times across his tenure with Stone Age. (*Id.* at 34:16-35:11). Near the end of his employment with the restaurant, Boynton's complaints about his compensation for overtime hours became "a pretty

14

regular thing." (*Id.* at 42:4-7). He broached the issue more often in the months leading up to his termination because he experienced the lack of overtime pay as "more detrimental to [him] as [he] took on . . . additional roles and worked more hours." (*Id.* at 36:16-19). Boynton asserted these complaints despite concerns Stone Age management might discharge him for raising the issue, as he believed Stone Age had previously discharged at least one other employee in retaliation due to a labor dispute. (*Id.* at 42:12-16, 47:3-13). Boynton's final, specific complaint about overtime compensation occurred on or around January 1, 2023. (Doc. 49-1 at ¶ 10).

Approximately two months before Boynton's termination, in November 2022, Stone Age warned Boynton about his behavior in relation to an incident involving a dog training clicker. (Doc. 44-2 at 9). Boynton had purchased the clicker and brought it into work as a "joke" for positive reinforcement of his coworkers. (Doc. 44-5 at 50:11-15). An incident occurred where Boynton used the clicker while reprimanding an employee under the age of 21 who persistently attempted to venture behind the bar. (*Id.* at 51:15-52:9). After instructing her to leave the bar area, he clicked the clicker and remarked, "Good, you're out of the bar." (*Id.* at 52:6-9). Subsequently, someone at Stone Age instructed Boynton, "Don't bring [the clicker] back anymore. You know, it was funny, but [the employee is] upset." (*Id.* at 50:18-51:1). Boynton alleges he did not know about any issue with the employee's father being upset or complaining about the incident. (*Id.* at 52:11-19). He also asserts no one at Stone Age mentioned the incident to him again after November 2022. (Doc. 49-1 at ¶ 9).

On January 13, 2023, Boynton alleges Stone Age manager Tim Swearingen retaliated against Boynton for Boynton's overtime pay complaints. (*Id.* at ¶ 11). Boynton attests he worked as a server captain on this day. (Doc. 44-5 at 42:19-22). While waiting tables, the restaurant host approached Boynton and informed him he should prepare for a party of ten. (*Id.* at 42:23-43:2). Boynton spent fifteen to twenty minutes preparing the party room in the back of the restaurant for the large party, during which time he asserts the host "skipped over" him and sat parties in other servers' sections. (Doc. 49-1 at ¶ 12-13; Doc. 44-5 at 44:2-5).

After setting up the party table, Boynton alleges Swearingen informed him, "You don't get that party." (Doc. 44-5 at 43:15-19). When Boynton queried why he could not wait on the party table, Swearingen retorted that he "was the manager and could do whatever he wanted and if [Boynton] questioned him again then he would fire [Boynton]." (Doc. 49-1 at ¶ 14). Boynton and Swearingen proceeded to argue about the tables Boynton received, which involved cursing in the bar area of the restaurant. (Doc. 44-5 at 44:19-45:11, 49:10-50:1; Doc. 49-1 at ¶¶ 14-17). Customers may have heard this altercation. (Doc. 49-1 at ¶ 19). The dispute ended with Swearingen discharging Boynton. (Doc. 44-5 at 45:11-13).

After Stone Age discharged Boynton, Boynton received a text from his then-girlfriend, Ayana Varnes, stating, "Yes, this was all to teach you a lesson, and he said if you come back and admit you were wrong and all this, they might let you have your job back." (*Id.* at 46:11-20).

16

## ANALYSIS

Boynton alleges Stone Age discharged him in retaliation for complaining about unfair overtime pay practices, in violation of the FLSA. The record portrays genuine issues of material fact regarding Boynton's retaliation claim, and thus, the claim proceeds to trial.

**A.    Boynton Establishes a *Prima Facie* Case for a Fair Labor Standards Act (FLSA) Retaliation Claim.**

The FLSA's anti-retaliation provision provides as follows:

> [I]t shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

To establish a *prima facie* case of FLSA retaliation, a plaintiff must demonstrate "(1) []he engaged in activity protected under [the] act; (2) []he subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000) (citation omitted). If the plaintiff established a *prima facie* case of retaliation, "the burden shifts to the employer to proffer a legitimate reason for the adverse action." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018). If the

employer provides a legitimate reason for the action, "the plaintiff must then establish that the proffered reason was pretextual." *Id.*[8]

Boynton engaged in protected activity under the FLSA by complaining to Stone Age management about his overtime compensation. (Doc. 44-5 at 31:18-35:11). The parties do not dispute Plaintiff first complained about overtime pay as early as his second paycheck, and he raised the issue through verbal complaints to Stone Age managers at least six (6) times during his employment. (Doc. 45-1 at ¶¶ 3-4; Doc. 50 at ¶¶ 3-4). Verbal complaints constitute protected acts under the FLSA's anti-retaliation provision. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 4 (2011). The Eleventh Circuit has held protected activity includes informal complaints to an employer. *E.E.O.C. v. White & Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989); *see also Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1278 (M.D. Ala. 2011) ("Even though [plaintiff] may not have mentioned the FLSA by name in any of his internal complaints, this does not disqualify his statements from being considered protected activity."); *Burnette*, 342 F. Supp. 2d at 1134 (holding informal complaints constituted protected

---

[8] Contrary to Defendant's assertion in its Reply (Doc. 52 at 10), this standard for evaluating an FLSA claim constitutes the same burden shifting standard set out in *McDonnell Douglas*. *See Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 822 (11th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)) (declaring FLSA claims "may be evaluated under the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*"); *see also, e.g., Jackson v. Laurens Cnty. Sch. Dist.*, 707 F. Supp. 3d 1401, 1413 (S.D. Ga. 2023), *appeal dismissed,* No. 24-10393-GG, 2025 WL 2233226 (11th Cir. July 7, 2025) (asserting the *McDonnell Douglas* burden-shifting framework applies to Plaintiff's FLSA retaliation claim); *Suchite v. Kleppin*, 819 F. Supp. 2d 1284, 1293 (S.D. Fla. 2011) ("Retaliation claims under the FLSA are analyzed using the familiar McDonnell Douglas framework applied to retaliation claims under Title VII, the ADEA and the ADA." (citing *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1133 (N.D. Ga. 2004))).

activity "so long as the complaint concerns the employer's wage and hour practices"). Therefore, Boynton's verbal complaints to his managers at Stone Age sufficiently establish the first element of his FLSA *prima facie*, retaliation claim.

The parties do not dispute Stone Age discharged Boynton, (doc. 45-1 at ¶ 6; doc. 50 at ¶ 6), and a discharge constitutes an adverse employment action under the FLSA. *See Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 648 (11th Cir. 2019) (finding an adverse employment action to consist of any actions "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination" (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006))). Therefore, Boynton has also established the second element of his FLSA retaliation claim.

The parties primarily contest whether Boynton has established a causal connection between his protected activity and his discharge. (Doc. 45-1 at 7; Doc. 50 at 8-9). At the *prima facie* stage, "this standard simply requires [Plaintiff] to show that his protected activity and the adverse employment action are *not completely unrelated*." *Johnson*, 778 F. Supp. 2d at 1279 (emphasis added). A plaintiff may establish a causal link by "prov[ing] a 'close temporal proximity' between the time [his] employer learned about [his] protected activity and [his] discharge." *Raspanti*, 266 F. App'x at 823 (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (FLMA retaliation) ("Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of

19

material fact of a causal connection.'" (quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000))); *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) (declaring "temporal proximity alone is sufficient to establish an inference of retaliation" if such proximity is "very close."). Adverse employment actions that occur within a month after protected activity denote a "close temporal proximity." *Valdes v. Kendall Healthcare Grp., Ltd.*, No. 23-12983, 2024 WL 3356965, at *4 (11th Cir. July 10, 2024) (citing *Thomas*, 506 F.3d at 1364); *see also Johnson*, 778 F. Supp. 2d. at 1279 ("Three months appears to be the outer limit of the temporal proximity test.").

In this instance, the parties do not dispute Boynton rendered multiple complaints to management about overtime pay, commencing in the first month of his employment. (Doc. 44-5 at 34:11-15; Doc. 45-1 at ¶ 3). Boynton asserts he complained "pretty regular[ly]" the month or two prior to his termination. (Doc. 44-5 at 42:4-7). He attests he lodged his final complaint about overtime compensation on or around January 1, 2023. (Doc. 49-1 at ¶ 10). Stone Age discharged Boynton approximately two weeks later on January 13, 2023. (Doc. 44-1 at ¶ 7). These alleged facts sufficiently establish a causal connection between the protected activity and Boynton's discharge. Accordingly, Boynton sustains his burden to assert a *prima facie* case of FLSA retaliation.[9]

---

[9] Stone Age references other nonretaliatory reasons for Boynton's termination (i.e., insubordination and the dog-clicker incident) to contend Boynton cannot establish the requisite causal connection between his FLSA complaints and his discharge. (Doc. 45-2 at 7-8; Doc. 52 at 7-9). Eleventh Circuit precedent requires a broad interpretation of the *McDonnell Douglas* causation prong at the *prima facie* stage. *See Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1273 (11th Cir. 2017); *Chapter 7*

**B.    Boynton Raises a Genuine Dispute of Material Fact Regarding Whether Stone Age's Asserted Reason for His Discharge Constitutes Pretext.**

The burden shifts to Stone Age to proffer a legitimate reason for discharging Boynton. *See Hornsby-Culpepper*, 906 F.3d at 1314. Stone Age provides two potential non-retaliatory reasons for Boynton's termination: the incident involving a co-worker and a dog clicker in November 2022, and Boynton's alleged insubordination towards management, specifically the argument with manager Tim Swearengin related to a party table. (Doc. 44-1 at ¶¶ 6-7; Doc. 44-2 at 8). Boynton asserts these reasons constitute "pretext to retaliate against him for engaging in protected activity." (Doc. 50 at 11).

To establish pretext, a plaintiff must provide sufficient evidence from which a jury could conclude "the proffered reason was not the true reason for [an] employment decision." *Raspanti*, 266 F. App'x at 823. A plaintiff may demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's justification. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007). In addition, "a plaintiff may rely on evidence previously submitted as part of [his] *prima facie* case" to prove pretext. *Dent v. Ga. Power*

---

*Tr. v. Gate Gourmet, Inc.*, 63 3F.3d 1249, 1260 (11th Cir. 2012) (declaring that at the *prima facie* stage, courts must construe the causation standard "broadly, requiring only that the protected activity and the negative employment action are not completely unrelated."); *accord Tucker v. Fla. Dep't of Transp.*, 678 F. App'x 893, 896 (11th Cir. 2017) ("[C]lose temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." (quoting *Hurlbert*, 439 F.3d at 1298)). Thus, "temporal proximity alone is sufficient to establish an inference of retaliation" if such proximity is "very close." *Brown*, 597 F.3d at 1182. Accordingly, Boynton's temporal proximity argument sufficiently satisfies the lower burden to portray causation at the *prima facie* stage. The court will address Stone Age's asserted legitimate reasons in examining whether they amount to pretext for Boynton's termination.

*Co.*, 522 F. App'x 560, 562 (11th Cir. 2013) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)).

In conjunction with the foregoing obligation, at the pretext stage a plaintiff must submit sufficient evidence for a reasonable juror to find "her protected activity was a but-for cause of the alleged adverse action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1334 (11th Cir. 2013) (reviewing but-for causation analysis at the pretext stage); *Booth v. Pasco Cnty., Fla.*, 757 F.3d 1198, 1207 (11th Cir. 2014) (eliciting but-for standard); *Wolf*, 200 F.3d at 1343 (At the pretext stage, a plaintiff must submit sufficient evidence for a reasonable juror to find "the adverse action would not have been taken 'but for' the assertion of FLSA rights." (citing *Reich v. Davis*, 50 F.3d 962, 965-66 (11th Cir. 1995))). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. As elaborated, this standard requires "proof that the [wrongdoer's] conduct did in fact cause the plaintiff's injury." *Id.* at 346. "In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020).

Thus, but-for causation manifests even "if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back." *Burrage v. United States*, 571 U.S. 204, 211 (2014); *see also Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1340

22

(11th Cir. 2023) ("It is true that if Yelling were correct that there were two but-for causes—unlawful retaliation and a lawful factor—she could have a claim if the two combined to result in an adverse action that would not have occurred without that combination. In that instance, the retaliation would be a but-for cause because the adverse action would not have occurred without it. The fact that a lawful consideration was also a necessary factor would not defeat her claim." (citing *Bostock*, 590 U.S at 656)). "This is so because it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter. It is beside the point that the [adverse action] also resulted from a host of *other* necessary causes . . . ." *Burrage*, 571 U.S. at 212 (emphasis in original). Distilling the foregoing principles, but-for causation requires that the alleged, retaliatory animus bear "a determinative influence on the employer's adverse decision." *Sims*, 704 F.3d at 1335-36 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

As an initial matter, the dog clicker incident yields negligible probative value upon the pretext inquiry. Both parties agree an incident occurred during which Boynton used a dog clicker to chastise an employee under the age of 21 who consistently attempted to venture behind a bar. Stone Age asserts it began "considering terminating Boynton" due to this incident prior to his discharge. (Doc. 44-1 at ¶ 6; Doc. 52 at 9). Drawing all reasonable inferences in Boynton's favor, a jury could find this incident did not give rise to or contribute to his discharge.

Although Boynton admits a Stone Age manager instructed him not to bring the clicker back because it upset the other employee, he alleges approximately two months passed between this incident and his discharge, during which time no one mentioned the incident to him again.[10] (Doc. 44-5 at 50:18-51:15; Doc. 49-1 at ¶ 9). Stone Age has presented no evidence it formally disciplined Boynton or memorialized any considerations of discharging him because of the incident. In addition, deposition testimony by Stone Age's agents and its interrogatory responses often do not include this incident as a reason for his discharge. (*See* Doc. 44-2 at 8 (stating Swearengin terminated Boynton for insubordination after a fight over a party table); Doc. 44-4 at 68:10-13 (asserting Boynton had "a fight over a table and had an argument with the manager, and the manager fired him")). Therefore, a reasonable juror may conclude this incident did not influence Stone Age's decision to discharge Boynton.

The primary, and sometimes sole, reason Stone Age asserts for discharging Boynton relates to alleged insubordination towards his manager during a disagreement about table assignments. (*Id.*; Doc. 44-2 at 8). Viewing the evidence in the light most favorable to Boynton, a reasonable jury could find this reason amounts to pretext for a retaliatory discharge.

---

[10] During his deposition, Boynton testified a Stone Age manager informed him the dog clicker upset the other employee, and the manager instructed him not to bring the clicker back to work. (Doc. 44-5 at 50:22-51: 2). In its Reply, Stone Age contends the deposition testimony contradicts Boynton's affidavit, in which he asserts no one informed him the clicker upset anyone. (Doc. 49-1 at ¶ 8; Doc. 52 at 5). Although Boynton's affidavit contradicts his earlier deposition testimony on this point, the court's reasoning persists even if someone at Stone Age informed Boynton the clicker upset another employee.

Principally, the parties avow diverging accounts about the argument between Boynton and his manager, which reflects a factual dispute warranting a denial of summary judgment.  Stone Age argues the dispute occurred because "Plaintiff attempted to take a table from another server after a manager told Plaintiff the table was not Plaintiff's," which resulted in Boynton's insubordination when he complained about the conduct.  (Doc. 45-1 at ¶ 7).

Alternatively, Boynton asserts the argument arose because Swearingen "would not allow Plaintiff to place tables under his own name in accordance with 'basic rules.'" (Doc. 50 at ¶ 7; *see also* Doc. 44-5 at 43:18-44:10; Doc. 44-4 at 68:21-69:21).  Further, Boynton contends Swearingen prevented him from waiting tables due to his complaints about overtime pay.  (*Id.* at ¶ 7; Doc. 44-3 at 3-4).  And, pursuant to reasonable inferences accorded in Boynton's favor, Varnes's communications buttresses Boynton's contention Swearingen retaliated against him vis-a-vis the table assignments.  (*See* Doc. 44-3 at 2 at 3-4 ("I was informed by a then current employee, Ayana Varnes, that Swearingen had stated to her I was fired to be taught a lesson and that I could have my job back if I would grovel.  Swearingen stated that my termination was not work-related and had nothing to do with my performance.  I understood I was being terminated for consulting an attorney."); Doc. 44-5 at 46:11-20 (referencing Varnes's text); *id.* at 58:9-18 (recounting Varnes's statement that Swearingen stated "'Well, that's what he had coming,'" and "'Well, you know, he didn't do anything, but we had to teach him a lesson'")).

In essence, Stone Age contends Boynton attempted to take a table "out of turn," leading to Boynton's insubordination and subsequent discharge. Contrastingly, Boynton maintains Swearingen diverted tables to other servers in retaliation for complaining about FLSA violations, leading to a dispute when Boynton pushed back against the conduct. (*Compare* Doc. 44-2 at 8 *with* Doc. 49-1 at ¶¶ 11-17). Under Boynton's version of events, which generally warrants credence as the non-movant's evidence, the retaliatory conduct of diverting tables precipitated the encounter, and thus, such conduct portrays a retaliatory animus bearing a determinative influence on Stone Age's discharge decision. *See Wilson v. N.Y. & Presbyterian Hosp.*, No. 21-1971-CV, 2022 WL 17587564, at *3 (2d Cir. Dec. 13, 2022) ("Given Wilson's testimony that the cutoff of overtime opportunities began right after he questioned his FLSA classification, as well as evidence that he worked substantial overtime hours pre-reclassification and none post-reclassification, we conclude that he has created a material issue of disputed fact as to whether NYP retaliated against him for engaging in protected conduct by denying him opportunities to work for overtime pay."); *Carter v. Cal. Grill, LLC*, 538 F. Supp. 3d 714, 723 (W.D. Tex. 2021) (finding genuine issue of material fact whether restaurant constructively discharged Black waitress for complaining about the use of racial slurs by retaliatorily reassigning tables such that she could not earn money on her shifts); *Corfey v. Rainbow Diner of Danbury*, 746 F. Supp. 2d 420, 427-28 (D. Conn. 2010) (finding genuine issues of material fact existed as to 1) whether waitress's hours were reduced so as to constitute an adverse employment

26

action; 2) whether preventing waitress from working larger, busier sections of restaurant represented an adverse employment action; and 3) whether reassignment of waitress to smaller, slower section of tables reflected a legitimate business goal); *c.f.*, *Gate Gourmet*, 683 F.3d at 1259 ("Withholding a position that an employee would otherwise receive under company policy, particularly when it results in her no longer having a job, might well dissuade a reasonable worker from making or supporting a charge of discrimination.").

That is, a reasonable jury may determine such retaliatory conduct evinces a "but for" cause of Boynton's discharge because it provoked the alleged insubordination ostensibly warranting the adverse action. *See Nichols v. Ill. Dep't of Transportation*, 152 F. Supp. 3d 1106, 1131-32 (N.D. Ill. 2016) ("Nichols's fax further described how Nichols had attempted to address the threats in a proper manner by contacting the EAP. Not only did the EAP not offer any help to Nichols, but it referred him to the Labor Relations Office, which also declined to help Nichols, which led Nichols to send the fax, which ironically was then used against him as a reason to fire him. Courts that have addressed similar situations have said that '[w]here the employer provokes a reaction from an employee, that reaction should not justify a decision to impose a disproportionately severe sanction.'" (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 210 (2d Cir. 1990)) (alteration in original)); *Stokes v. Accts. Receivable Mgmt., Inc.*, No. CIV A 05-00437 JBS, 2006 WL 3228025, at *6 (D.N.J. Nov. 2, 2006) ("Although Plaintiff concedes she got upset when she was accused of leaving work without permission, this

'insubordination' would not insulate her termination from this Court's review if, as a reasonable jury could find, Edward Dugan intentionally provoked this reaction to create an apparent justification for firing Plaintiff in retaliation for her complaint against him. In this situation, the Court cannot say as a matter of law that summary judgment is appropriate on the retaliation claims . . . ."); *c.f.*, *Sumner*, 899 F.2d at 210 ("As for the charge of insubordination, . . . the record suggests that Montemarano acted in a manner that could be counted on to elicit a rise from Sumner. Where the employer provokes a reaction from an employee, that reaction should not justify a decision to impose a disproportionately severe sanction." (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 709 (3d Cir. 1989))); *Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir. 1999) ("It is not necessary that the actual termination decision be motivated by discriminatory animus. . . . If the decision making process is tainted by discrimination, the claimant is entitled to relief. . . . When an employee is fired because he acted to defend himself against harassment, which supervisors failed to take reasonable measures to prevent or correct, the termination process cannot be said to be free from discrimination. . . . . This is so even if the ultimate decision maker was moved purely by a legitimate concern about personnel matters.") (citations omitted); *Taylor v. Cardiovascular Specialists, P.C.*, No. 1:11-CV-4521-TCB-RGV, 2013 WL 12310269, at *25 (N.D. Ga. Dec. 11, 2013), *report and recommendation adopted,* 4 F. Supp. 3d 1374 (N.D. Ga. 2014) (A "'pattern of antagonism following the protected conduct' is one form of circumstantial evidence evidencing a causal connection . . . . Such a pattern may be established by showing 'heightened

scrutiny, negative criticism, differential treatment or violation of standard internal protocol and procedures.'") (citations omitted).

In addition, there remains a genuine dispute of fact whether the manner in which Boynton complained about the table assignments epitomized insubordination. Stone Age contends Boynton "yelled and cursed at the manager on duty at a volume where patrons and other co-workers could hear." (Doc. 45-1 at ¶ 7). Boynton contends he sustained hearing damage while serving in the military and often speaks loudly without noticing, (doc. 44-5 at 48:5-9), and thus, he acknowledges the argument "might have gotten loud," (*id.* at 48:10-12). At first blush, the foregoing evidence portrays behavior that unreasonably disrupted the workplace.

Nonetheless, Boynton did not "think that it was so loud that it was a detriment to the actual restaurant." (*Id.*). Boynton remarked he did not "think the patrons might have heard," and he also contends Swearingen swore at him. (*Id.* at 49:11-12). He described the altercation as "a mutual thing," stating,

> It wasn't one-sided. It wasn't me standing over him yelling and swearing and he was just like, "Oh, please calm down." In my recollection, it came off with him swearing and yelling at me and, you know, I believe at one point I even tried to pull this outside or away, but it was definitely more of a mutual thing.

(*Id.* at 49:17-50:1).[11] These diverging descriptions of the altercation amount to a factual dispute regarding the charge of insubordination that remains inappropriate for resolution at the summary judgment stage.

The foregoing finding also informs the assessment whether Boynton opposed Swearingen's alleged, unfair conduct in a reasonable manner. In the analogous context of Title VII retaliatory discharge claims, the "requirement that opposition to allegedly unlawful employment practices must be done in a reasonable manner is well-established." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1141 (11th Cir. 2020)[12]; *see also Rosser v. Laborers' Int'l Union of N. Am., Loc. No. 438*, 616 F.2d 221, 223 (5th Cir. 1980) ("Even though opposition to an unlawful employment practice is protected, such protection is not absolute. There may arise instances where the employee's conduct in

---

[11] Contrary to Stone Age's assertion in its Reply, nothing in Boynton's affidavit contradicts his deposition testimony in this regard. In his declaration, Boynton states he "do[es] not believe that any customers could hear [their] conversation because it was away from everybody." (Doc. 49-1 at ¶ 15). However, he also attests "it is possible some customers heard us." (*Id.* at ¶ 19). As revealed, there exists no inherent contradiction between Boynton's deposition testimony and his affidavit attestations in this regard. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) (When reviewing a purportedly contradictory affidavit, the court must clearly distinguish between "discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." (citing 6 Moore's Federal Practice § 56.15(4) (2d ed. 1985) ("An opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility.")))); *Bell v. City of Auburn, Ala.*, 722 F. App'x 898, 899 (11th Cir. 2018) (A court may disregard an affidavit as a sham only in those "limited circumstances" when the affidavit inexplicably and "flatly contradicts the affiant's own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously."). Boynton's Response perhaps oversells his argument, stating "Plaintiff testified that the conversation occurred where no customer could hear the two." (Doc. 50 at 4). More precisely, Boynton testified he did not *believe* customers overheard the encounter. (Doc. 44-5 at 49:11-12). Regardless, the court proceeds upon the assumption Boynton remains uncertain as to whether customers could hear the altercation.

[12] *See Burns v. Blackhawk Mgmt. Corp.*, 494 F. Supp. 2d 427, 433 (S.D. Miss. 2007) (applying Title VII's retaliation jurisprudence in the context of a FLSA retaliatory discharge complaint).

protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered by [Title VII].")[13]; *Tebo v. City of DeBary, Fla.*, 784 F. App'x 727, 731 (11th Cir. 2019) ("[W]e have held that 'the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable.'" (quoting *Rollins v. State of Fla. Dep't of L. Enf't*, 868 F.2d 397, 400-01 (11th Cir. 1989))); *Rollins*, 868 F.2d at 400-01 ("Though the legislative history of section 704(a) is murky,' it is well established that the protection afforded by the statute is not absolute. This court has repeatedly recognized that some otherwise protected conduct may be so disruptive or inappropriate as to fall outside the statute's protection.") (citations and footnote omitted).

In evaluating the reasonableness of an employee's opposition to an alleged, unlawful employment practice, the court must assess the evidence "on a case by case basis by balancing the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." *Rollins*, 868 F.2d at 401. "[E]ven if an employee's oppositional conduct does not interfere with the employee's performance of [his] own duties, it can still be deemed unreasonable – and thereby lose its protected status – if the opposition is expressed in a manner that unreasonably

---

[13] Fifth Circuit decisions handed down prior to October 1, 1981, bind courts in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

disrupts other employees or the workplace in general." *Gogel*, 967 F.3d at 1141. Nevertheless, "[w]hen the defendant offers evidence that plaintiff's conduct was outside the protection of [applicable law], and therefore provided the defendant with a nondiscriminatory reason for its employment action, the plaintiff is entitled to an opportunity to show that his activities were reasonable under the circumstances and were warranted by the employer's conduct." *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1145 (5th Cir. Unit A Sept. 1981). In assessing the reasonableness of an employee's expression of opposition, the court should consider "how a reasonable employee positioned in a context comparable to that of the plaintiff would react . . . ." *Covington v. Sailormen Inc*, No. 1:10-CV-00252-MP-GRJ, 2011 WL 13112567, at *5 (N.D. Fla. June 3, 2011); *see also Savignac v. Day*, 754 F. Supp. 3d 135, 203-04 (D.D.C. 2024), *adhered to as amended,* 763 F. Supp. 3d 17 (D.D.C. 2025) (considering whether discharged employee's email constituted a threat in the context of other emails exchanged with his employer).

The question ensues whether a reasonable factfinder could deem Boynton's argument with Swearingen inappropriate insubordination or a reasonable opposition to Swearingen's alleged, unlawful retaliatory conduct. The parties dispute the facts surrounding the reasonableness of Boynton's conduct in the encounter, which renders summary judgment on the issue inappropriate.

As an initial matter, the preceding analysis of the pretext inquiry revealed a disputed issue of fact whether Boynton's opposition to the table assignments

exemplified insubordination.   In addition, context matters as to whether Boynton reacted reasonably in contesting the table assignments.   Boynton asserts he "often witness[ed] other employees get into arguments or even shouting matches in the restaurant where customers could here [sic]."   (Doc. 49-1 at ¶ 2).   This testimony provides important contextual information about the "productive work environment" cultivated by Stone Age as well as the "behavior Stone Age accepted from employees."[14] *See Rollins*, 868 F.2d at 401.   Therefore, the existence of a genuine, disputed issue regarding the characterization of Boynton's opposition as insubordination compels the same result vis-à-vis the reasonableness of Boynton's opposition to the alleged, retaliatory practice.

---

[14] Stone Age argues this evidence bears no relevance in the context of an FLSA retaliation claim, as compared to an employment discrimination case, because the existence of similarly situated employees does not factor into the FLSA framework.   (*See* Doc. 52 at 10-11).   Although the FLSA retaliation framework does not incorporate consideration of similarly situated employees as an evaluation factor, Stone Age's treatment of other employees in similar circumstances bear relevance to whether Boynton reasonably opposed Swearingen's alleged retaliatory behavior.   *See Springer*, 509 F.3d at 1348 (A plaintiff may demonstrate pretext by exposing "weaknesses, implausibilities, *inconsistencies*, incoherencies, or *contradictions*" in the defendant's justification.") (emphasis added); *cf. Salter v. Smurfit Stone Container Enters., Inc.*, No. CV 07-0011-CG-M, 2007 WL 9717650, at *13 (S.D. Ala. Dec. 5, 2007) (finding employer's discipline of employee who frequently disrupted the workplace with complaints of racial discrimination appropriate when the employee "acted inappropriately and [the employer] treated her outburst consistently with its treatment of similar outburst by other employees").

In addition, Stone Age contends Boynton's claims about other employees yelling or cussing in the restaurant do not represent comparable situations because he "claims he witnessed other employees yell at other employees, and witnessed managers yell at customers and employees, [but] he never alleges that any other subordinate ever yelled and cussed a manager in public and still escaped termination."   (Doc. 52 at 12).   Notwithstanding these contentions, Boynton's testimony as to the work environment still bears relevance as to whether Boynton's argument with Swearingen constituted a significant disruption to the environment Stone Age regularly tolerated.   Furthermore, Boynton constituted a long-term employee and former manager, which indicates leeway other employees may not have enjoyed.

## C.  Stone Age's Remaining Arguments Do Not Warrant Summary Judgment.

Stone Age lodged other arguments attacking the nature of Boynton's evidentiary submission.  First, it contends Boynton only "create[ed] issues of fact by citing to his own inconsistent [affidavit] testimony" that diverged from his deposition testimony, and then it asserts Boynton's evidence amounts to "speculation, opinion, or conjecture."  (Doc. 52 at 3); *see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  Hence, Stone Age beseeches disregard of such evidence and an assessment Boynton's allegations do not evince a genuine dispute of material fact because they lack a basis in the record.  (*Id.*).  Stone Age's contentions do not shift the balance in favor of summary judgment.

First, Stone Age must tender its characterization of inconsistent testimony to the jury for appraisal.  "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  Pursuant to this principle, a court presented with such an affidavit may disregard its contents as a "sham" when assessing a motion for summary judgment.  *Id.* at 656.  Importantly, however, when reviewing a purportedly contradictory affidavit, the court must clearly distinguish between "discrepancies which create transparent shams and discrepancies which create an issue

of credibility or go to the weight of the evidence." *Tippens*, 805 F.2d at 953 (citing 6 Moore's Federal Practice § 56.15(4) (2d ed. 1985) ("An opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility.")) (alteration in original).  That is, "every discrepancy contained in an affidavit" does not evince a sham, and "[i]n light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).

Accordingly, the court may disregard an affidavit as a sham only in those "limited circumstances" when the affidavit inexplicably and "flatly contradicts the affiant's own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously." *Bell*, 722 F. App'x at 899; *see Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1307 (11th Cir. 2016) (The district court should apply the sham affidavit rule "sparingly because of the harsh effect it may have on a party's case." (quoting *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316 (11th Cir. 2007))); *Sears v. PHP of Ala., Inc.*, No. 2:05cv304-ID (WO), 2006 U.S. Dist. LEXIS 18460, at *30 (M.D. Ala. Apr. 10, 2006) ("The sham affidavit rule sets a high threshold in order to prevent courts from invading the province of the jury by deciding credibility questions and weighing the evidence.").  That is, precedent requires "a court to find some inherent

inconsistency between an affidavit and a deposition before disregarding the affidavit." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987).

None of the alleged discrepancies chronicled by Stone Age rise to the level of inherent inconsistencies compelling disregard of the affidavit Boynton tendered in opposition to summary judgment. First, Stone Age takes issue with Boynton's testimony and affidavit regarding how many tables Swearingen assigned to Boynton on the day of their argument. (Doc. 52 at 3-4). However, Boynton's testimony regarding the number of tables he serviced and whether Swearingen refused to assign him tables does not contain inherent inconsistencies.

In his deposition, Boynton testified, "we're pretty busy, I'm taking care of my tables, and I'm told by the host that I have a party of ten coming in." (Doc. 44-5 at 42:22-43:2). He further explained, "I think I had like a table or two and I was told, 'You're getting this ten-top.'" (*Id.* at 43:9-11). In addition, Boynton asserts he began serving the tables before he argued with Swearingen. (*Id.* at 43:9-21). In his affidavit, Boynton attested "Tim Swearingen[] began to retaliate against me by preventing me from waiting on tables," (doc. 49-1 at ¶ 11), and the Response declared that "[e]ventually, because Plaintiff complained, Tim Swearingen began preventing Plaintiff from waiting on any tables," (doc. 50 at ¶ 7).

The foregoing attestations in Boynton's affidavit and Response do not inherently contradict his deposition testimony. Obviously, a reasonable interpretation of the declarations indicates Boynton served tables until the host ordered him to prepare a

party table, and thereafter Swearingen prevented him from serving tables after he complained about table assignments.

Likewise, Boynton's deposition testimony regarding "starting a table" does not exhibit an inherent inconsistency with his affidavit. Boynton testified at his deposition as follows: "So once [Swearingen] told me I was fired, you know, I started a table and I was like 'Well, I'm going to finish this table and leave.'" (Doc. 44-5 at 46:4-7). Boynton's insistence on completing service for a table he commenced before his discharge does not indicate Swearingen assigned him all tables he was due pursuant to restaurant practice. Indeed, Boynton testified he "[sat] [t]here with one table for an hour" after he questioned Swearingen about not assigning him the party table. (*Id.* at 45:1-2). Surely, a reasonable jury may deem one assignment within an hour's time as an effort to preclude a server from waiting tables.

Furthermore, Boynton's deposition testimony that managers could control the "front of the house," (*id.* at 26:18-28:9), does not inherently contradict his affidavit attestation that Swearingen "couldn't just take tables away from [him]," (doc. 49-1 at ¶ 14). Regardless of Swearingen's managerial authority, a reasonable jury may deem Boynton's affidavit attestation as reflecting Swearingen should not unfairly preclude him from serving tables, especially if Boynton believed it violated a particular restaurant policy or otherwise constituted retaliatory conduct.[15]

---

[15] Stone Age also ascribes fault to Boynton's assertion Swearingen prevented him serving tables on the day of his discharge, as that assertion purportedly contrasts with Boynton's acknowledgement "he

Stone Age contends Boynton's affidavit and Response inconsistently declare Stone Age discharged him for complaining about overtime pay because Boynton's "deposition testimony confirms that nothing about overtime was brought up by him or Stone Age during the insubordination that led to his termination." (Doc. 52 at 4-5). Contrary to Stone Age's contention, Boynton has not asserted he complained about overtime compensation on the day of his discharge. (Doc. 50 at 3-5). Rather, Boynton maintains Stone Age discharged him for complaining about overtime compensation, and more concretely vis-à-vis the day of his termination, Stone Age discharged him for opposing retaliatory conduct perpetrated by Swearingen regarding table assignments. (*See id.* at 3 ("Defendant terminated Plaintiff's employment because Plaintiff . . . oppos[ed] Defendant taking retaliatory action against Plaintiff."); *id.* at 5 ("Tim Swearingen terminated Plaintiff's employment because Plaintiff complained about not receiving his overtime pay and opposing Defendant's attempts to retaliate against him by refusing to allow Plaintiff to wait tables – ultimately resulting in Plaintiff's termination.")).

Boynton's testimony consistently depicts his belief Stone Age discharged him in retaliation for complaining about overtime pay, regardless of whether the parties actually discussed overtime pay the day of the table assignment incident. In his

---

was told he did not get the large party because he was 'next in line'" as well as "Stone Age's explanation that Boynton attempted to take the larger party table 'out of turn.'" (Doc. 52 at 4). Stone Age's contention does not warrant a different conclusion: just because Stone Age proffered and informed Boynton as to the reasons for the table assignments does not indorse the veracity of those representations.

interrogatory responses, which he served prior to his deposition, Boynton attributed his discharge to retaliatory animus. (*See* Doc. 44-3 at 2 ("I believe I was improperly terminated by the defendant because I complained about my pay and advised my manager, Tim Swearingen, I was contacting an attorney to address the situation. I further base my belief on the fact that I had observed other co-workers being disciplined or terminated when they complained to management."); *id.* at 3-4 ("After informing Tim Swearingen, who I understand advised the owner, that I was contacting an attorney regarding improper compensation, the defendant terminated my employment. I anticipated this action based on my observation of the defendant reacting to other employee complaints. Further, I was informed by a then current employee, Ayana Varnes, that Swearingen had stated to her I was fired to be taught a lesson and that I could have my job back if I would grovel. Swearingen stated that my termination was not work-related and had nothing to do with my performance. I understood I was being terminated for consulting an attorney.")).

During his deposition, the foregoing interrogatory answers spurred Boynton's testimony about the reasons for his discharge. (Doc. 44-5 at 38:19-39:32). In such testimony, Boynton alluded to retaliatory animus as the reason for his discharge. (*See id.* at 40:6-41:6 (testifying his complaints about managerial pay "put a target on [his] back" for "rejecting" their compensation accord); *id.* at 42:6-16 (testifying his "pretty regular" complaints about overtime pay "annoyed" and "threatened" Stone Age, and he "was always kind of worried because they had fired people before for, you know,

what seems like pure retaliation for, you know, taking tips and stuff like that, you know, other labor disputes"); *id.* at 44:7-13, 45:6-7 (describing Swearingen's diversion of table assignments as "weird," "not really fair," and "purposely messing" with his job and taking income from him); *id.* at 45:20-46:1 (construing Swearingen's unfair table assignment as "an intent to kind of drive [him] out, "like, 'Oh, you can work here, but we're going to make sure you make no money, and then when you question it, we're going to fire you"); *id.* at 46:11-20 (referencing Varnes's text); *id.* at 58:9-18 (recounting Varnes's statement that Swearingen stated "'Well, that's what he had coming,'" and "'Well, you know, he didn't do anything, but we had to teach him a lesson'")).

Therefore, that the parties did not discuss overtime compensation during the incident in question does not categorically dispel—or inherently contradict—Boynton's contention that retaliatory animus motivated his discharge.  Indeed, Stone Age's contentions in this regard overlook established principles regarding the nature of pretext.  *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021) (plaintiffs may advance past summary judgment in the *McDonnell-Douglas* framework by demonstrating "proffered nondiscriminatory reasons 'are a pretextual ruse designed to mask retaliation.'") (citation omitted); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 569 (7th Cir. 2015) ("Employers cannot retaliate against employees who complain about violations of Title VII under the ruse that the employee was being 'disloyal' or 'insubordinate' by opposing the unlawful activity.").  Based upon the review of the foregoing testimony, Boynton contends his complaints about overtime compensation

instigated Swearingen to retaliate by preventing him from waiting tables, which in turn precipitated the encounter resulting in Boynton's discharge. This version of events remains consistent throughout Boynton's testimony. (*See* Doc. 44-3 at 2-4; Doc. 44-5 at 38:19-46:11; Doc. 49-1 at ¶¶ 11-18). That no one mentioned overtime compensation on the day of Boynton's discharge does not hinder a reasonable jury from finding retaliatory animus caused the adverse action.

Finally, Stone Age contends that "any possible reason Plaintiff could offer suggesting pretext is his own speculation or opinion," which Stone Age claims "does not rise to the level of evidence to suggest an issue of fact." (Doc. 45-1 at 9). "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citing *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993)); *see also Cordoba*, 419 F.3d at 1181 (holding plaintiff's argument her supervisor terminated her because of her disability constituted mere speculation when plaintiff's own affidavit stated her supervisor informed plaintiff of her termination before plaintiff told her supervisor she needed her employee health insurance to cover a heart surgery); *Dowdell-McElhaney v. Glob. Payments Inc.*, No. 23-10334, 2024 WL 2796976, at *6 (11th Cir. May 31, 2024), *cert. denied,* 145 S. Ct. 1083 (2025), *reh'g denied,* 145 S. Ct. 1466 (2025) (finding plaintiff could not establish defendant's reason for her termination constituted pretext when she provided no evidence of a causal connection between her discrimination claim and her termination, her proposed comparators did not represent similarly situated employees, and she

asserted only an opinion her employer's justification for her termination constituted pretext); *Langston v. Lookout Mountain Cmty. Servs.*, 775 F. App'x 991, 1000-01 (11th Cir. 2019) (holding plaintiff's FLSA retaliatory discharge claim failed at the pretext stage because although plaintiff argued her actions did not constitute insubordination, she did not rebut defendant's assertion the decisionmaker on her discharge understood she violated her supervisor's order); *Harapeti v. CBS Television Stations, Inc.*, No. 20-CV-20961, 2022 WL 1274049 (S.D. Fla. Mar. 1, 2022), *report and recommendation adopted,* No. 20-20961-CIV, 2022 WL 1024775, at *10 (S.D. Fla. Apr. 6, 2022) (finding plaintiff could not establish pretext when she failed to meaningfully respond to defendant's nonretaliatory reason for her adverse employment action as she offered only conclusory assertions she faced retaliation).

Contrary to Stone Age's claims, Boynton has provided more than opinion, conjecture, or mere speculation to support his claim Stone Age retaliated against him. The parties do not dispute Boynton complained directly to Swearingen about overtime wages. (*See* Doc. 44-5 at 41:11-41:21; Doc. 44-1 at 71:5-13). The parties also agree Swearingen alone made the decision to terminate Boynton. (*See* Doc. 44-2 at 8; Doc. 44-5 at 45:11-13, 46:7-11). Therefore, the evidence amounts to more than mere speculation Boynton complained to Swearingen, the decisionmaker on the adverse action, about overtime compensation prior to Swearingen's decision to discharge Boynton.

Boynton also provided record evidence suggesting, beyond unwarranted opinion and speculation, Swearingen's reason for dismissing Boynton constituted a pretext for discharging him. The foregoing review of the evidence demonstrates Boynton's complaints preceded his discharge, and Boynton, based upon reasonable inferences garnered from his interactions with Swearingen, variably described Stone Age as "annoyed" and "threatened" by his complaints. Furthermore, Boynton asserts Varnes informed him after his discharge "this was all to teach [Boynton] a lesson." (Doc. 44-5 at 46:16-17). Varnes also recounted that Swearingen remarked, "'Well, that's what he had coming,'" and "'Well, you know, he didn't do anything, but we had to teach him a lesson.'" (*Id.* at 58:9-18). In addition, that the table assignments on the day in question may have been "weird" and not "fair" (which, again, represent reasonable inferences based upon Boynton's knowledge of the workplace's practices), *id.* at 44:7-13, 45:6-7, buttresses the specter of retaliatory conduct.

Furthermore, Boynton's assessment the table assignments constituted retaliatory conduct that harmed his income does not reflect unreasonable conjecture or speculation, particularly given the temporal proximity of Boynton's complaints about overtime compensation as well as the alleged frequency in which he lodged those complaints. *See Gate Gourmet*, *supra* 683 F.3d at 1259 (11th Cir. 2012) ("Withholding a position that an employee would otherwise receive under company policy, particularly when it results in her no longer having a job, might well dissuade a reasonable worker from making or supporting a charge of discrimination."); *Wilson*, *supra*, 2022 WL

43

17587564, at *3 ("Given Wilson's testimony that the cutoff of overtime opportunities began right after he questioned his FLSA classification, as well as evidence that he worked substantial overtime hours pre-reclassification and none post-reclassification, we conclude that he has created a material issue of disputed fact as to whether NYP retaliated against him for engaging in protected conduct by denying him opportunities to work for overtime pay."); *Carter*, *supra*, 538 F. Supp. 3d at 723 (finding genuine issue of material fact whether restaurant constructively discharged Black waitress for complaining about the use of racial slurs by retaliatorily reassigning tables such that she could not earn money on her shifts); *Corley*, *supra*, 746 F. Supp. 2d at 427-28 (finding genuine issues of material fact existed as to 1) whether waitress's hours were reduced so as to constitute an adverse employment action; 2) whether preventing waitress from working larger, busier sections of restaurant represented an adverse employment action; and 3) whether reassignment of waitress to smaller, slower section of tables reflected a legitimate business goal).

A reasonable jury may gauge the foregoing evidence reflects retaliation against Boynton for his complaints about overtime compensation, not "speculation, opinion, or conjecture."[16]  Thus, Boynton has presented evidence sufficient to raise a genuine

---

[16] Stone Age's contentions imply Boynton has failed to rebut its "honest belief" Swearingen discharged him due to insubordination.  *See Gogel*, 967 F.3d at 1148 ("'The inquiry centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.  The question is whether the employers were dissatisfied with the employee for these or other non-discriminatory reasons, even if mistakenly or unfairly so . . . .'  The relevant inquiry is therefore whether the employer in good faith believed that the employee had engaged in the conduct that led the employer to discipline the employee.") (cleaned up, citations omitted).

Notwithstanding the "honest belief" principle, consistent, longstanding circuit precedent maintains a plaintiff may proffer evidence refuting the employer's honesty in its belief. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (declaring the honest-belief inquiry entails an assessment whether an employer "merely used [its articulated justification for adverse action] as cover for discriminating against" an employee (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (characterizing inquiry as limited to whether employer *believed* employee was guilty of misconduct and if so, *whether that was reason behind discharge*)), *cited in Gogel*, 967 F.3d at 1148); *Elrod*, 939 F.2d at 1470 (""[O]ur inquiry is limited to whether the employer gave an honest explanation of its behavior.'") (citation omitted); *Turner v. Tex. Instruments, Inc.*, 555 F.2d 1251, 1257 n.6 (5th Cir. 1977), *overruled on other grounds by Burdine v. Tex. Dep't of Cmty. Affs.*, 647 F.2d 513 (5th Cir. 1981), *and disapproved of on other grounds by Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981) ("This is not to say that [an employee] could not recover if [an employer disparately evaluated the employee's conduct] because of his race. . . . Nor does this say that [an employee] could not recover in a case where the employer's belief is so incredible in light of the facts found that the belief was not validly held and thus failed as . . . a valid reason for the employer's action."); *see also Paul v. Murphy*, 948 F.3d 42, 51 (1st Cir. 2020) (holding plaintiff failed to establish pretext where plaintiff claimed her alleged low evaluation scores were based on mistakes of others without establishing her new supervisor did not actually believe plaintiff was responsible for the mistakes at issue); *Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016) ("A plaintiff can meet this burden [to raise a genuine dispute about the employer's honest belief in its proffered explanation] by casting doubt on the objective validity of the employer's explanation"); *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 795-96 (7th Cir. 2015) (providing plaintiff has to raise genuine issue about honesty, not accuracy, of reason for adverse action).

As the analysis herein reveals, Boynton has submitted evidence sufficient to refute any purported honest belief Stone Age discharged him due to insubordination. Viewing the evidence in a light most favorable to Boynton, a reasonable jury may conclude Swearingen altered table assignments in retaliation for Boynton's complaints about overtime compensation, and such alteration provoked Boynton's discharge when he complained about the assignments. Moreover, there exists a genuine issue of material fact whether Boynton confronted Swearingen about the table assignments in an unreasonable manner. Viewing the totality of the evidence, the inquiry amounts to a trial assessment whether Swearingen honestly believed Boynton engaged in insubordination, or whether Swearingen enacted retaliatory conduct to engender Boynton's discharge. That is, did Swearingen discharge Boynton for insubordination, or did he discharge Boynton for reasonably opposing retaliatory table assignments? Or perhaps even more appropriate based upon recent Supreme Court elaboration of the but-for causation standard, did retaliatory animus cause Boynton's discharge despite a motivation to discharge Boynton for alleged insubordination? *See Burrage*, 571 U.S. at 211, 212 (But-for causation manifests even "if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back. . . . This is so because it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter. It is beside the point that the [adverse action] also resulted from a host of *other* necessary causes . . . .") (emphasis in original); *see also Yelling*, 82 F.4th at 1340 ("It is true that if Yelling were correct that there were two but-for causes—unlawful retaliation and a lawful factor—she could have a claim if the two combined to result in an adverse action that would not have occurred without that combination. In that instance, the retaliation would be a but-for cause because the adverse action would not have occurred without it. The fact that a lawful consideration was also a necessary factor would not defeat her claim." (citing *Bostock*, 590 U.S. at 656)). In any event, a jury must answer any such questions.

issue of material fact whether Stone Age's proffered reason for discharging him represents a pretext for retaliation. That is, a jury could find Stone Age retaliated against Boynton because he complained frequently about overtime pay in the weeks prior to his discharge, not because of alleged insubordination.

## CONCLUSION

For the foregoing reasons, the court **DENIES** in part Stone Age's Motion to Strike, (doc. 51). The court further **DENIES** Stone Age's Motion for Partial Summary Judgment, (doc. 45).

**DONE** and **ORDERED** this 20 day of November, 2025.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE